## STATE v. WILLIAM ELWOOD.

Upon a trial of an indictment for murder, when there is not one single circumstance in the immediate transaction to justify, excuse or mitigate the homicide, the Judge presiding committed no error in telling the jury that malice was implied, and that the offence was murder.

INDICTMENT for *Murder*, originally found in the Superior Court of CLEAVELAND county, and removed upon affidavit to the county of Gaston, from which it was subsequently removed to the county of MECKLENBURG, and there tried before his Honor, Judge SCHENCK, at Spring Term, 1875.

After the jurors were sworn but before they were empanelled, the counsel for the prisoner moved the Court to adjourn, stating that he wished to examine the record to make objection, if necessary, but that he had no specific objection to make at that time. The Court refused the motion, and the prisoner excepted. The jury was then empanelled and the witnesses sworn, and the Court took a recess. After the Court met the counsel for the defendant filed a paper, of which the following is a copy. " Objections to the transcript":

1. That the transcript of the record from Cleaveland county is not certified by the Clerk of Gaston as a true record, but only sets out the transcript of the record, as furnished by the Clerk of Cleaveland.

2. That the transcript of the record from Cleveland should be sent from Gaston as the best evidence of the record.

3. That the transcript of the record from Cleaveland does not set forth that a foreman of the grand jury was appointed by the Court, nor that the person who signed the bill as such, was such foreman.

4. That in the certificate of the transcript of the record from Gaston county, the Clerk certifies that the seal of the Court was affixed at Dallas, and not at the office of the Clerk.

The counsel for the prisoner then moved that the record be not received.

The Court informed the counsel that if they would ask for a *certiorari*, alleging that the record was untrue, the Court would send for it at once and suspend the trial until a proper record was received. The counsel for the prisoner replied, "we would rather it would go on," and the record was received and the trial proceeded.

George L. Foushee was introduced as a witness for the State, and testified as follows:

He was a boarder at the house of J. B. Falls, in Cleaveland county, as was also William Elwood, the prisoner, and Alexander Sandford, the deceased. Witness and Sandford worked as laborers in Ki g's Mountain mine. On Sunday, the 17th day of May, 1874, about seven o'clock in the morning, he was out at the door of Mr. Falls' house, and the prisoner and the deceased came out of the house, near him, and stopped. Elwood then pulled out a box of cartridges and showed them to the deceased, and said: "Don't you want a dose of these?" Sandford laughed, and extended his hand as if to take one, and Elwood, drawing his own hand back, said: "No, you can't have these, but I have one for you. Stop, and I will give it to you." Elwood then immediately walked off in a path, about eight steps, the deceased following behind. No word was spoken until they had gone about eight steps, when the prisoner, looking back over his shoulder, said: "Stop, you are too close," and immediately jerked out, with his right hand, a pistol from the hip of his pants, and wheeling around on his left foot fired quickly at the deceased. The ball entered the head of the deceased a little to the right of the left eye. Deceased fell, and instantly died. The prisoner and the deceased were facing each other at the time the pistol was fired. Witness did not think the prisoner cocked the pistol while turning around, as it was done so quickly. When deceased fell, the prisoner came to where the witness was, eight steps off, then walked back to where deceased lay, then returned to witness again, and said: "I have shot this man." Witness replied,

"I reckon not." The prisoner then said, "Yes, I have." The prisoner then walked back to where the deceased lay, and again returned to where witness was standing, eight steps off, and said : "Now, I have killed this man, and I hate it. Lord have mercy on my soul !" The prisoner then went back into the house; and nothing else was said. The deceased was about two feet from the muzzle of the pistol when it was fired, and about four feet from the prisoner when his arm was extended.

A pistol was exhibited, and admitted by both parties to be the pistol with which the homicide was committed. It was a breech loading cartridge Derringer, about one half inch in the bore. The pistol was loaded by touching a spring and turning the barrel to one side and inserting the cartridge. When the barrel was turned to one side, it threw the cartridge out and left the cylinder empty to receive a new one. The cock of the pistol had to be drawn back with the hand, and then thrown by pulling the trigger, before it could be fired. The cock had two catches, so that it could half cock or whole cock.

On cross examination the witness testified, that the range of the ball through the head of the deceased was about level. The prisoner and deceased had no quarrel that witness ever heard. They were friendly as far as he knew; they seemed to have been intimate. They did not appear angry when they came out. The prisoner went into the house and remained until the doctor came ; except that one or two hours after the homicide occurred, witness and prisoner went away and then returned together.

Counsel for the prisoner then proposed in order to rebut malice to ask witness "if he and the prisoner did not go to a magistrate's house, and that prisoner did not try to escape ?"

The evidence was objected to by the Solicitor, and the Court sustained the objection, whereupon the prisoner excepted. The witness then stated that the prisoner was arrested about dark that evening at Fall's house. The magistrate came there. Witness thinks Dr. Ware sent for the officer. The prisoner

was kept under arrest all night at Fall's house and taken to Shelby on Monday morning.

In reply to the question "How prisoner looked after the homicide," witness said "he looked frightened." Witness was asked why he said to the prisoner "I reckon not," when the prisoner said "I have killed that man;" he replied "because I did not expect it." The witness further stated that the prisoner had been absent from Fall's for three days and had returned the night before the homicide occurred. He had seen the prisoner and deceased play together at the boarding house. Sandford was a laborer in the mine, Elwood was not. They both boarded at Fall's.

John Noblett testified as follows: He was a boarder at Fall's where the homicide was committed. On the morning it occurred he was up in the loft of the house laying on the bed. The house was a double log cabin, with a passage down stairs. The stairs to the loft went up outside. Before breakfast, and about one hour and a half before the homicide, he heard the prisoner and the deceased talking in the passage. Deceased said to the prisoner: "What knocked the skin off your chin?" The prisoner replied, "my horse ran under a limb with me." Deceased then said "I expect some one rocked you," and the prisoner replied "it was you, damn you, and I will shoot you." On cross-examination the witness testified as follows: They seemed to be in friendly tone, not angry. "They talked like common." He saw them together after that, talking friendly. He had seen them play together. From where he was lying in the loft to the passage was eight or ten feet. He could not be mistaken as to the language, he certainly heard that. There were other parts of the conversation that he did not hear.

W. H. Rule being introduced as a witness, swore that he was in the passage with the prisoner and the deceased on Sunday morning, before the homicide. Sandford said to the prisoner, "What made that scar on your chin." The prisoner replied "my horse ran under a limb with me." Deceased said, "How

far off was the man who threw at you." The prisoner replied " fifteen steps." Some remarks followed, which witness did not hear. Witness was two or three steps off. Could have heard it all if he had tried to do so. They did not seem to be mad. Witness had only been there three or four days. Prisoner then put his right hand in the right hip pocket of his pants and drew out his pistol, but kept it down by his side and looked down at it. Witness does not think that Sandford saw the pistol. Prisoner's left side was toward the deceased. Witness was in front of them. This was an hour or more before the homicide occurred.

The prisoner introduced no evidence, but asked the following written instructions :

I. That if the jury believe the defendant was not moved by malice towards the deceased it is but manslaughter; in any event.

That if they believe the defendant was in sport in presenting the pistol, and either did not know it was loaded, or if loaded did not know it was cocked, he is not guilty of murder.

3. That if they are satisfied the defendant had no malice to the deceased, but was showing the deceased, at his request how he could spring the breech from the stock and fling the cartridge out, that he was guilty of no offence, and should be acquitted altogether.

The Court, among other things, charged the jury : " That murder was the killing of a fellow being in malice, and where there was no malice, there was no murder. But wherever a killing with a deadly weapon is proved or admitted, the law presumes that it was done in malice, and nothing else appearing in the case, it would be the duty of the jury to convict of murder.

So, in this case, it is admitted by the defendant's counsel that the prisoner did kill the deceased with a pistol, which is a deadly weapon, and the law presumes it was done in malice. This presumption, however, may be rebutted, and the *onus* of doing this, is on the defendant. It is his duty to satisfy your

minds that this presumption, raised by the law, is in fact in this case erroneous.

The defendant says in reply to this presumption of law, that the evidence shows that the shot was accidental, or in sport, and not fired in malice ; and if this were so, if it was accidental or in sport, it would at least mitigate the offence to manslaughter. I have listened to the argument of counsel patiently and have fully reflected on the testimony given in the case, and I feel it to be my duty to charge you that there is no evidence "fit to go to a jury " to establish the defence of accident or sport. It may be sufficient to raise a conjecture, but that is not the character of evidence required by the law. If, therefore, you believe that the prisoner shot the deceased, as described by the witness, Foushee, with a pistol and killed him, the law presumes malice, and it is your duty to convict."

The jury retired and after being out sometime returned in a body to the Court and took their seats in the box. The Court inquired if they had agreed, and the foreman informed his Honor that they had not. The Court then asked if they desired any instructions in regard to the law, and the foreman replied in the negative. The Court then told them that they could not be discharged, that they must again retire and try to agree. The foreman then informed the Court they could not agree as to the question of malice. The Court then told the jury that the killing with a deadly weapon being admitted by the prisoner, the law presumed malice, and there was no evidence in this case to rebut the testimony.

The jury returned a verdict of guilty, and thereupon the prisoner moved for a new trial, which motion being refused, he moved in arrest of judgment, was overruled and judgment of death pronounced. From this judgment the prisoner appealed.

*Hoke* and *Battle*, for the prisoner.
*Attorney General Hargrove*, for the State.

READE, J. It was admitted for the prisoner, and it was

also clearly proved on the trial, that he killed the deceased. And it was also admitted and proved that the deceased gave the prisoner no provocation. Why, then, is not the prisoner guilty of murder?

The prisoner puts his defence upon the ground of accident. "That the prisoner was showing the deceased the pistol, and either to alarm him, or show him how the cartridge could be thrown out, brought the pistol round and it accidentally fired." His Honor charged the jury that there was no evidence to support this defence. And whether there was or not, is the only question before us.

There was but one witness who testified as to the immediate circumstances of the killing. He was standing in the yard, and the prisoner and the deceased came up to him; and the prisoner pulled out a box of cartridges and said to the deceased, "Don't you want a dose of these?" Deceased laughed, and offered to take one; and prisoner said, "No, you can't have these; but I have one for you; step out and I will give it to you." Prisoner walked immediately off, and deceased followed. Prisoner looked back over his shoulder and said to the deceased, "Stop, you are too close;" and immediately jerked out a pistol, wheeled around and fired quickly, and shot the deceased through the head and killed him.

We have looked earnestly for some feature of the transaction that would tend to favor the theory of the defence, "that the prisoner was just showing the deceased his pistol, and how the cartridge could be thrown out; and that it fired accidentally." Every circumstance disproves it. He had not said a word about showing the deceased his pistol. He had shown his box of cartridges, and asked the significant question, "Don't you want a dose?" And the deceased offered to take one. Prisoner said, "No, not these; I have one for you; come out and I will give it to you." Why not give it to him there? Why want to step aside? Why not show his pistol then and there? Why step aside? If he wanted to show his pistol and explain it, why *jerk* it out, and *wheel* and fire *quickly?* If his object

was to show the pistol, or the cartridge, why say " Stop, you are too close ?"

There not being one single circumstance in the immediate transaction to justify, excuse or mitigate the homicide, his Honor could do no other than tell the jury it was murder.

Although that may be true of the immediate transaction, yet the prisoner says that there were circumstances before and after the transaction which support his theory.

The circumstances relied on are, first, that they were upon friendly terms before the transaction ; secondly, that he manifested sorrow immediately after the transaction ; and, thirdly, that he had an opportunity to escape and did not do it.  And there was evidence tending to prove these circumstances ; so that we must take them to have been proved.  And we must leave out of view the evidence that the prisoner had that morning cursed the deceased and threatened to shoot him, and charged him with having thrown a rock at him the night before and hit him.  We must leave that out, and take the circumstances relied on by the prisoner ; because his Honor held that, taking the circumstances relied on by the prisoner to be true, they amounted to nothing.

Where the *immediate* circumstances of the killing are such as to make it of *doubtful* character, then it is proper to look to circumstances farther off to enable us to solve the doubt. But, if without the slightest justification, excuse or provocation occurring at the time, A takes a pistol from his pocket and shoots B and kills him, how is it possible that any circumstances further off can mitigate the crime?  If the prisoner says that he and the deceased had always been friendly, it only makes it the worse for him to have killed his friend.  If he says they were enemies, it tends to show that he killed him of malice.  If he regrets it, repentance may secure pardon, but cannot remove guilt.  If he does not attempt to escape, it relieves him from that slight confirmatory evidence of guilt, but it does not change or explain the transaction.  It is said that, as it is settled that an attempt to escape is evidence of

guilt, so the converse ought to be true, and not attempting to escape is evidence of innocence. But that is sophistical. It may be proved against a prisoner that he acknowledged his guilt, but he cannot prove as evidence of his innocence that he denied his guilt. Much less can he rely upon the fact that he shut his mouth and said nothing. A prisoner cannot manu facture testimony for himself after the event, either by words or acts. As neither of these circumstances by itself amounts to anything, do they when all put together? A and B are friends. A, without any apparent excuse, justification or pro- vocation, takes a pistol from his pocket and shoots B and kills him; expresses his regret, but makes no explanation, and does not flee. Is it possible to state a plainer case of murder? The prisoner says that the fact that there was no cause for it, is some evidence that he did not do it of malice. But the rule is, and the sacredness of human life requires that the rule should be, precisely the contrary. Where the killing is with- out cause—without provocation—then malice is *implied.* A man is no more excused for killing his friend than he is for kill- ing his enemy. He that sheddeth man's blood by *man* shall *his* blood be shed. But the prisoner insists that if he killed him without provocation, that fact shows that he did not kill him of malice. And it is clear that if he did kill him upon suffi- cient provocation, that rebuts malice. And so it comes to this, that a killing, with or without provocation, is not murder!

We have considered the case as if the prisoner had proved all that he offered to prove, and there is nothing to sustain his theory of accident, or to rebut the presumption of malice. But that is a very favorable view for the prisoner, because there was evidence that he had that morning charged the de- ceased with having thrown a rock at him the night before and hit him; and he cursed the deceased and threatened to shoot him. At the same time drawing the pistol and holding it so that the deceased could not see it.

There is no error. This will be certified to the end, &c.

PER CURIAM.                                Judgment affirmed.